MOTOROLA, INC., a Delaware
corporation, Defendant
Below, Appellant,

v.

AMKOR TECHNOLOGY, INC., a
Delaware corporation, Plaintiff
Below, Appellee.

No. 521, 2003.

Supreme Court of Delaware.

Submitted: March 9, 2004.

Decided: May 27, 2004.

Jeffrey L. Moyer, Richards, Layton & Finger, Wilmington, DE, J. Timothy Eaton (argued) and Joel A. Blanchet, Ungaretti & Harris, Chicago, IL, for appellant.

John L. Reed (argued), Daniel V. Folt and Matt Neiderman, of Duane Morris, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND and JACOBS, Justices.

HOLLAND, Justice:

This is an appeal from a final judgment. The Superior Court entered an opinion and order granting plaintiff-appellee, Amkor Technology, Inc.'s ("Amkor") motion for summary judgment and denying defendant-appellant, Motorola, Inc.'s ("Motorola") motion for summary judgment. The dispute involves third-party Citizen Watch Co., Ltd.'s ("Citizen") assignment of its Patent License Agreement ("PLA") with Motorola to Amkor.

Motorola contends that Motorola's and Citizen's intent in entering into the Agreement, as expressed in the plain terms of the PLA, precludes the assignment. Amkor claims that the assignment is valid. We conclude that, in the context of the PLA, the terms "license" and "assignment" are ambiguous and a material issue of fact exists, precluding summary judgment. Therefore, the judgment of the Superior Court must be reversed.

### Facts

Amkor and Motorola are currently in the business of, among other things, developing and providing semiconductor assembly test services and products, commonly referred to as ball grid array packages ("BGA Packages"). BGA Packages are a housing apparatus for integrated circuit structures that are used to make semiconductor products. Both Motorola and Amkor hold patents relating to BGA Packages. Prior to selling its BGA Assembly Business Unit to Amkor on March 28, 2002, Citizen was also in this business and also held certain patents relating to BGA Packages.

On June 30, 1993, Motorola and Amkor entered into an Immunity Agreement, pursuant to which Motorola and Amkor provided each other with cross-releases and cross-licenses for their BGA Package patents. In consideration of Motorola's grant of a license to Amkor, the Immunity Agreement required Amkor to pay royalties to Motorola on a quarterly basis for use of Motorola's BGA Package patents. The royalty payments were based on Amkor's quarterly use of the technology covered by the patents. Amkor paid Motorola approximately $36.8 million under the Immunity Agreement for use of Motorola's

technology. The Immunity Agreement expired by its own terms on December 31, 2002.

On January 25, 1996, Motorola entered into the PLA with Citizen. The PLA grants Citizen the right to use the same Motorola BGA Package patents that are the subject of the Immunity Agreement between Motorola and Amkor. The PLA grants at least two specific rights to Citizen that were not granted to Amkor. First, Motorola and Citizen cross-license their respective patents governing BGA packaging technology on a royalty-free basis. Second, the PLA with Citizen includes an assignment from Motorola to Citizen of an undivided one-half interest in two of Motorola's U.S. patents: Patent No. 5,241,133 (the "Mullin Patent"); and Patent No. 5,216,278 (the "Lin Patent"). Amkor was required to pay Motorola for use of these two patents under the Immunity Agreement, and was granted no ownership interest in them.

The PLA also contains restrictions on Citizen's ability to transfer its royalty-free rights to third parties. These restrictions are set forth in Sections 4.1 and 5.1 of the PLA. Section 4.1 of the PLA expressly prohibits Citizen from entering into contracts with a set list of companies to license its royalty-free rights to the Mullin and Lin patents:

> CITIZEN agrees not to offer to enter into or to enter into a contract with current BGA licensees of MOTOROLA, including those listed in Appendix A [*inter alia*, Amkor], for a license to make, have made, or sell BGAs under U.S. Patent Nos. 5,241,133 [Mullin] and/or 5,216,278 [Lin].

Section 5.5 of the PLA[1] limits Citizen's ability to transfer or assign its rights under the agreement, as follows:

---

**1.** Section 5.6 of Motorola's Immunity Agreement with Amkor contains the exact same

provision as Section 5.5 of the PLA.

The rights or privileges provided for in this Agreement may be assigned or transferred by either party only with the prior written consent of the other party and with the authorization or approval of any governmental authority as then may be required, except to a successor in ownership of all or substantially all of the assets of the assigning party relating to the business unit employing the patents licensed hereunder but such successor, before such assignment or transfer is effective, shall expressly assume in writing to the other party the performance of all the terms and conditions of this Agreement to be performed by the assigning party.

On March 28, 2002, Amkor purchased substantially all of the assets of Citizen's BGA Assembly Business Unit. Concurrently with the sale of Citizen's business, Citizen and Amkor entered into an Intellectual Property Assignment Agreement ("IPAA") that "assigns" to Amkor Citizen's PLA with Motorola as well as Citizen's one-half interest in the Mullin and Lin Patents. The IPAA requires Citizen to gain the necessary consents for the alleged assignments from all relevant entities but "exclud[es] any consent that may be required from Motorola."

After the IPAA was executed, Amkor advised Motorola that Amkor had taken over Citizen's ownership rights in the Mullin and Lin Patents, and acquired a royalty-free license to the Motorola BGA patent portfolio under the PLA. Motorola informed both Citizen and Amkor that they were in material breach of their respective agreements with Motorola, and that the alleged transfers were invalid under Section 4.1. Amkor stopped paying royalties to Motorola for the second and third quarters of 2002, and stated that it would not pay royalties for the fourth quarter of 2002.

### Declaratory Judgment Actions

On August 26, 2002, Amkor filed a declaratory judgment action in the Superior Court. Amkor originally sought a declaration that Citizen's transfer of the Mullin and Lin Patents and the assignment of the PLA were valid. Amkor also sought a declaration that it was not required to make royalty payments to Motorola for the duration of the Immunity Agreement, which expired by its own terms on December 31, 2002. Motorola counterclaimed against Amkor for breach of the Immunity Agreement, and also sought a declaration that Amkor was obligated to make timely royalty payments to Motorola under the Immunity Agreement.

Motorola and Amkor have resolved their dispute over Amkor's payments to Motorola under the Immunity Agreement. On June 24, 2003, the parties filed a Stipulation and Order Dismissing Certain Claims that outlines their agreement. The only issue left for the Superior Court to resolve was "the validity, legality or effectiveness of the assignment to Amkor of the Intellectual Property and the Patent License Agreement."

### Summary Judgment Motions

Both Motorola and Amkor moved for summary judgment on their remaining declaratory judgment claims. The parties agreed that Illinois law governed the interpretation of the PLA and that, for purposes of their respective motions, there was no genuine issue of material fact. Additionally, the parties agreed that Section 4.1 of the PLA prohibits Citizen from contracting to grant a license for the BGA Package patents with a current Motorola licensee, which included Amkor.

The parties disagreed, however, over the interpretation of Section 5.5 of the PLA. Amkor argued that, because the terms "li-

cense" and "assignment" have distinct meanings, the "plain meaning" of Section 5.5 permitted an assignment to Amkor. Accordingly, Amkor contended, the PLA's only restriction on assignment without Motorola's consent would not arise in the event of an acquisition of all or substantially all of the assets of Citizen related to the BGA Package patents.

Conversely, in its cross-motion for summary judgment, Motorola argued that, in the context of the PLA, the terms "assignment" and "license" had the same meaning. According to Motorola, Citizen's "assignment" of the BGA Package patents was in actuality a "license." Motorola argued that Amkor's agreement with Citizen was invalid because Section 4.1 of the PLA prohibits licensing of the patents to current licensees, such as Amkor.

### Superior Court Decision

The Superior Court noted that the PLA contained no definitions of the terms "license" or "assignment." Therefore, it looked to the "commonly accepted meanings" from *Black's Law Dictionary*,[2] which defined an assignment as the "act of transferring to another all or part of one's property, interest, or rights."[3] *Black's* defined a license as "a personal privilege to do some particular act or series of acts . . . ."[4] Based on these definitions, the Superior Court rejected Motorola's claim that a license is subsumed in the definition of an assignment.

Instead, the Superior Court concluded that the terms license and assignment "are distinct and separate, as used in Section 4.1 and Section 5.5, involving different obligations and responsibilities." Consequently, the Superior Court held that "[a]lthough Motorola may not have intended to allow Citizen and Amkor to circumvent [Section] 4.1 by assigning the patents to Amkor via [Section] 5.5, that is what is permitted by the clear meaning of the language of the . . . PLA." Accordingly, the Superior Court granted Amkor's motion for summary judgment and denied Motorola's cross-motion.

### Standard of Review

▉ Motions for summary judgment are subject to *de novo* review. This Court reviews *de novo* the Superior Court's grant of summary judgment both as to facts and law to determine whether or not the undisputed facts, viewed in the light most favorable to the opposing party, entitle the moving party to judgment as a matter of law.[5] If material issues of fact exist or if a court determines that it does not have sufficient facts to enable it to apply the law to the facts before it, then summary judgment is inappropriate.[6]

Although Amkor and Motorola have taken the position that there are no material facts in dispute, that does not necessarily mean that summary judgment must be granted to one of the parties.[7] Cross-motions for summary judgment are not the

2. See, e.g., *Weinberger v. Bell Federal Sav. and Loan Ass'n*, 262 Ill.App.3d 1047, 200 Ill.Dec. 308, 635 N.E.2d 647, 652 (1994) ("Words used in a contract are to be given their ordinary, natural, and commonly accepted meanings unless it clearly appears that the parties intended to ascribe to them a peculiar or unusual definition.").

3. *Black's Law Dictionary* 119 (6th ed. 1990).

4. *Id.* at 920.

5. *Rhudy v. Bottlecaps, Inc.*, 830 A.2d 402, 405 (Del.2003).

6. *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979); *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del.1962).

7. *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del.2002).

procedural equivalent of a stipulation of decision on a paper record.[8] Because the parties have not agreed that the "paper record shall constitute the trial record," the Superior Court or this Court may determine that a disputed issue of material fact exists that precludes summary judgment for either moving party.

### Illinois Contract Law

The PLA contract at issue in this case expressly provides that it is governed by the law of Illinois, under which "the primary goal in construing a contract is to give effect to the intent of the parties."[9] In determining the parties' intent, the contract must be read as a whole.[10] When the language of the contract is clear and unambiguous, the parties' intent must be determined solely from the plain language of the contract.[11] If the contract language creates an ambiguity, however, extrinsic evidence is permissible and the interpretation of the language becomes a question of fact.[12]

Illinois follows the general rule that a contract is not ambiguous merely because the parties disagree as to its meaning.[13] Rather, "[a] contract is properly found ambiguous when the language used is susceptible to more than one meaning or is obscure in meaning through indefiniteness of expression."[14] Therefore, if reasonable people may draw different inferences from the undisputed facts, an ambiguity exists and summary judgment is inappropriate.[15]

### Parties' Intent

In construing a contract, the primary objective for any court is to give effect to the parties' intent. Accordingly, in deciding on the interpretation of the PLA, the Superior Court's principal goal under Illinois law was to ascertain Citizen's and Motorola's intent in entering into the contract.[16] Thus, the dispositive question in this litigation is what was the parties' intention?

In determining the parties' intent with regard to Section 4.1 and 5.5, Illinois law required the Superior Court to consider the contract as a whole and not focus on the sections as isolated provisions.[17] Sec-

**8.** *Id.*

**9.** *Premier Title Company v. Donahue,* 328 Ill. App.3d 161, 262 Ill.Dec. 376, 765 N.E.2d 513, 516 (2002) (citing *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.,* 256 Ill.App.3d 31, 195 Ill.Dec. 701, 628 N.E.2d 1165, 1168 (1993)).

**10.** *Id.* (*citing Spectramed, Inc. v. Gould, Inc.,* 304 Ill.App.3d 762, 237 Ill.Dec. 578, 710 N.E.2d 1, 6 (1998)).

**11.** *Owens v. McDermott, Will & Emery,* 316 Ill.App.3d 340, 249 Ill.Dec. 303, 736 N.E.2d 145, 150 (2000).

**12.** *Installco Inc. v. Whiting Corp.,* 336 Ill. App.3d 776, 271 Ill.Dec. 94, 784 N.E.2d 312, 319 (2002).

**13.** *Id.*

**14.** *Meyer v. Marilyn Miglin, Inc.,* 273 Ill. App.3d 882, 210 Ill.Dec. 257, 652 N.E.2d 1233, 1238 (1995) (quotations and citations omitted).

**15.** *Olympic Restaurant Corp. v. Bank of Wheaton,* 251 Ill.App.3d 594, 190 Ill.Dec. 874, 622 N.E.2d 904, 908 (1993); *Berutti v. Dierks Foods, Inc.,* 145 Ill.App.3d 931, 99 Ill.Dec. 775, 496 N.E.2d 350, 352 (1986).

**16.** *See, e.g., In re Marriage of Findlay,* 296 Ill.App.3d 656, 231 Ill.Dec. 31, 695 N.E.2d 548, 550 (1998) ("The principle rule is that a court must ascertain and effectuate the parties' intent.") (citations omitted); *Curran Contracting Co. v. Woodland Hills Dev. Co.,* 235 Ill.App.3d 406, 176 Ill.Dec. 843, 602 N.E.2d 497, 502–03 (1992).

**17.** *See, e.g., Spectramed, Inc. v. Gould, Inc.,* 304 Ill.App.3d 762, 237 Ill.Dec. 578, 710 N.E.2d 1, 6 (1998).

tion 4.1 of the PLA explicitly precludes Citizen from "licensing" its rights to the Mullin and Lin Patents to Amkor. If an "assignment" to Amkor is allowed by Section 5.5, however, Motorola argues that such an assignment will render the restrictions of Section 4.1 meaningless.[18]

Motorola argues that it intended to preclude current BGA licensees, such as Amkor, from obtaining royalty-free use of the BGA Package patents from Citizen. Section 4.1 of the PLA expressly prohibits Citizen from contracting for a license with "current BGA licensees" of Motorola. It is undisputed that Amkor was a current BGA licensee. Amkor concedes that Section 4.1 creates a bar to its agreement with Citizen.

Nevertheless, Amkor argues that Section 5.5 of the PLA creates a specific exception to the prohibition in Section 4.1. In support of this argument, Amkor points to the language of Section 5.5, which allows assignment of the BGA Package patents without the express written consent of Motorola if the acquiring party succeeds in ownership in "all or substantially all of the assets of the assigning party relating to the business unit employing the patents licensed hereunder...."[19] Accordingly, Amkor contends that the PLA restricts Citizen from sublicensing the technology for profit, but allows assignment of all of Citizen's rights that would be occasioned by a sale of all or substantially all of its relevant business unit assets.[20]

### Contract Ambiguous

Whether Motorola's or Amkor's interpretation of the parties' intent is correct is dependent on the meaning of the terms "license" and "assignment." Amkor argues that the plain meaning of those terms show that they are separate and distinct. Conversely, Motorola argues that a "license" is subsumed within an "assignment." Thus, under Amkor's reading of the contract, the PLA precludes a "license" but allows "assignment." Under Motorola's reading, by prohibiting Citizen from "licensing" the BGA Package Patents to current licensees such as Amkor, the PLA necessarily precludes an "assignment" as well.

Both Motorola's and Amkor's interpretations of the PLA contract language may be reasonable. Where more than one plausible construction of a contract exists or the contract is ambiguous because two or more key provisions conflict, an issue of material fact arises and summary judgment must be denied.[21] A provision is "key" or "material" if a reasonable person would "attach importance to [it] ... in determining his choice of action in the transaction in question ...."[22]

18. *See, e.g., USG Corp. v. Sterling Plumbing Group, Inc.*, 247 Ill.App.3d 316, 186 Ill.Dec. 830, 617 N.E.2d 69, 71–72 (1993).

19. In addition, the acquiring party must also notify the remaining party to the PLA that they are assuming the performance of all of the terms and conditions of the PLA.

20. *See In re Marriage of Holderrieth*, 181 Ill. App.3d 199, 129 Ill.Dec. 896, 536 N.E.2d 946, 948–49 (1989) (stating that parties' intentions are drawn solely from the language of the contract).

21. *See Meyer v. Marilyn Miglin, Inc.*, 273 Ill. App.3d 882, 210 Ill.Dec. 257, 652 N.E.2d 1233, 1238 (1995); *Olympic Restaurant Corp. v. Bank of Wheaton*, 251 Ill.App.3d 594, 190 Ill.Dec. 874, 622 N.E.2d 904, 908 (1993); *Berutti v. Dierks Foods, Inc.*, 145 Ill.App.3d 931, 99 Ill.Dec. 775, 496 N.E.2d 350, 352 (1986).

22. Restatement (Second) of Torts § 538(2) (1977) (discussing what constitutes a material fact).

The Superior Court held that the specific *licensing* restrictions of Section 4.1 do not modify the general *assignment* provisions of Section 5.5, with the result that as long as the requirements of Section 5.5 are met, the assignment is valid. To reach that conclusion, the Superior Court relied upon *Black's Law Dictionary*'s definitions of the terms "license" and "assignment." The Superior Court held that, as long as the assignment provisions of Section 5.5 are met, the licensing prohibitions of Section 4.1 are irrelevant.

 The Superior Court concluded that although "Motorola may not have intended to allow Citizen and Amkor to circumvent [Section] 4.1 by assigning the patents to Amkor via [Section] 5.5, that is what is permitted by the clear meaning of the Motorola/Citizen PLA." As a general rule, whenever it is possible, a court must preserve the reasonable expectations that form the basis of the parties' contractual relationship.[23] In this case, contrary to that legal principle, the Superior Court held that the language in Section 5.5 bound Motorola to what may have been the *unintended* consequences that Section 4.1 prohibited. The Superior Court's construction of Section 5.5, in apparent isolation from Section 4.1, was contrary to the law of Illinois.[24]

 Contract terms are controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.[25] When the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity.[26] In those circumstances, the interpreting court must look beyond the language of the contract to ascertain the parties' intentions.[27] In this case, the Superior Court should have, but did not, look to parol evidence to interpret the PLA.

To the extent that the parties' intent cannot be determined from the plain terms of the PLA or the parties' intent is open to more than one interpretation, the Superior Court should have considered parol evidence to resolve the ambiguity.[28] The ambiguity in the meaning and the application of the contract language in the PLA created material issues of fact that required the Superior Court to admit and consider parol evidence. Those material issues of fact must be resolved by the trier of fact, and cannot be resolved by a summary judgment procedure.

### Conclusion

The judgment of the Superior Court is reversed. This matter is remanded for

**23.** *Eagle Industries v. DeVilbiss Health Care,* 702 A.2d 1228, 1232–33 (Del.1997).

**24.** *See, e.g., Kerton v. Lutheran Church Extension Fund,* 262 Ill.App.3d 74, 199 Ill.Dec. 416, 634 N.E.2d 16, 20 (1994) ("Based on our construction of the contract as drafted, we conclude that the trial court's interpretation of paragraph 7(a) in apparent isolation from the contract's other pertinent provisions was erroneous.").

**25.** *Eagle Industries v. DeVilbiss Health Care,* 702 A.2d at 1233.

**26.** *Id.* at 1232.

**27.** *Id.* at 1232–34

**28.** *See, e.g., Pepper Const. Co. v. Transcon. Ins. Co.,* 285 Ill.App.3d 573, 220 Ill.Dec. 707, 673 N.E.2d 1128, 1130 (1996) ("If contract terms are ambiguous, or capable of more than one interpretation, parol evidence is admissible to determine the intent of the parties.") (citing *Quake Const., Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 152 Ill.Dec. 308, 565 N.E.2d 990, 994 (1990)). *See also Installco Inc. v. Whiting Corp.,* 336 Ill.App.3d 776, 271 Ill.Dec. 94, 784 N.E.2d 312, 319 (2002).

further proceedings in accordance with this opinion.